# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### STATESBORO DIVISION

CLARISSA GILMORE,          )
                           )
    Plaintiff,        )
                           )
v.                         )          CV618-115
                           )
ALBERTA W. MILTON, *et al.*  )
                           )
    Defendants.       )

## REPORT AND RECOMMENDATION

Plaintiff, Clarissa Gilmore, brought this 42 U.S.C. § 1983 action alleging that she was subjected to an unconstitutional strip search at Smith State Prison when she was visiting an inmate. *See, e.g.,* doc. 50 at 1. The defendants moved for summary judgment, asserting, among other arguments, that they were entitled to qualified immunity against Gilmore's remaining claims. *See generally* docs. 50 & 52. The Court directed the defendants to supplement their summary judgment materials because of an omission in their citation to the record. *See generally* doc. 62. The defendants responded. Doc. 63. The deadline for Gilmore's response to the supplement has passed without any filing from her. *See* doc. 62 at 13 (providing plaintiff "the fourteen-day period

provided by this Court's Local Rules to respond."). The Court, therefore, proceeds to consider the defendants' arguments for summary judgment.

## BACKGROUND[1]

On February 26, 2017, Clarissa Gilmore visited her ex-husband, who was incarcerated at Smith State Prison. Doc. 50-2 at 1; doc. 52-2 at 1. Defendant Milton was the "Officer-in-Charge" at the time of Gilmore's visit. Doc. 50-2 at 1; doc. 52-2 at 1. Milton was also one of the officers who performed the disputed search. *See* doc. 50-1 at 10-12; doc. 52-2 at 4-5. Defendant Irizarry was assigned to other duties, but was present at and participated in the disputed search. Doc. 50-2 at 2, 10-12; doc. 52-2 at 1, 4-5. Defendant Lupo was the officer assigned to monitor the Visitation Room. Doc. 50-2 at 2; doc. 52-2 at 1. Defendant Smith was a Deputy Warden of Security on the date of the incident, but Plaintiff contends that Smith was not present at the Prison on the date of the search. Doc. 50-2 at 2; doc. 52-2 at 1.

Gilmore arrived at the Prison at around 10:30 a.m. and was subjected to standard screening procedures. Doc. 50-2 at 6; doc. 52-2 at

---

[1] The Court's Order directing supplemental briefing included a recitation of the factual background of this case. *See* doc. 62 at 2-6. The Court repeats that recitation below for completeness.

2.  Prior to her admission to the Visitation Room, Gilmore was subjected to a "pat-down" search, screening by a "metal detector wand," and "a body scan." Doc. 52-1 at 3; doc. 56 at 2.  No contraband was detected during any of those initial screenings.  Doc. 52-1 at 3; doc. 56 at 2.  After the initial screening, Gilmore was admitted to the Visitation Room.  Doc. 50-2 at 6; doc. 52-2 at 2.  Lupo was present in the Visitation Room when Gilmore arrived, and several other unidentified officers were also present.  Doc. 50-2 at 6; doc. 52-2 at 2.  Lupo testifies that "Gilmore approached [her] to be directed to a table," where inmates and visitors sit.  Doc. 50-4 at 2.  Gilmore does not affirmatively dispute that testimony, but "does not recall who was sitting at the desk . . . ." Doc. 52-2 at 2. Lupo testifies that "[a]t that time, [*i.e.*, when Gilmore approached her to be directed to a table,] [she] detected the smell of marijuana." Doc. 50-4, at 2.  Gilmore "denies smelling like marijuana during her visit." Doc. 52-2 at 2.  Despite allegedly detecting the odor of marijuana, Lupo did not take any immediate action; she testifies that she "elected to continue to monitor Ms. Gilmore and [her inmate ex-husband] . . . ." Doc. 50-4 at 2.  Plaintiff does not dispute that the search did not occur until "at least thirty minutes" into her visit.  Doc. 52-1 at 4; doc. 56 at 2.  Lupo

testifies that, during that period, she "noted that Plaintiff and [the inmate] were focused on [Lupo's] movements through the Visitation Room rather than conducting their visit[,]" and she found that focus "suspicious because those who intend to transfer contraband will watch the officers to see when their attention is otherwise distracted to perform the transfer." Doc. 50-2 at 8; *see also* doc. 50-4 at 3.[2] Plaintiff testifies that she "did not focus on, look in the direction, and/or engage with . . . Lupo." Doc. 52-3 at 3.

The remaining facts are strenuously contested. Lupo and Milton testify that Lupo informed Milton "that [Lupo] had detected the smell of marijuana on Plaintiff when Plaintiff checked into the Visitation Room[, and] further . . . that [Lupo] had watched Plaintiff and [her ex-husband] and noticed that they were monitoring the officer's presence rather than interacting with each other." Doc. 50-2 at 8; *see also* doc. 50-4 at 3; doc.

---

[2] The Court notes that the precise chronology and duration is ambiguous. Gilmore states that she was in the Visitation Room for "at least thirty minutes before her strip search," doc. 52-1 at 4, and defendants do not dispute that statement, doc. 56 at 2. Defendant's Statement of Material Facts states that Lupo observed Gilmore and her ex-husband "for an extended period of time." Doc. 50-2 at 8. Lupo's declaration places the duration of her observation at "approximately an hour." Doc. 50-4 at 3.

4

50-5 at 2.  Plaintiff disputes that assertion.  Doc. 52-2 at 3.[3]  Milton testifies that she determined that "Lupo's report was sufficient basis for requesting a strip search . . . ."  Doc. 50-2 at 8.  Milton testifies that, in response to Lupo's report, she contacted Smith "to obtain verbal approval" for the search.  Doc. 50-2 at 9.  Both Milton and Smith testify that he approved the search.  *Id*. at 9.

Because the protocols for conducting a strip search require two officers of the same sex to be present, Milton requested Irizarry to assist her.  Doc. 50-2 at 10; doc. 52-2 at 4.  It is undisputed that, prior to Milton's request, Irizarry "had no involvement with the development of the reasonable suspicion to perform [the] strip search."  Doc. 50-2 at 10; doc. 52-2 at 4.  Milton approached Plaintiff in the Visitation Room and requested that Plaintiff accompany her.  Doc. 50-2 at 10; Doc. 52-2 at 4.  Although the sequence of events is not entirely clear, Milton presented

---

[3] The substance and basis for Plaintiff's dispute are not entirely explicit.  In her response to defendants' Statement of Material Facts, she disputes the statement only to the extent that she "denies smelling like marijuana and/or looking at or focusing on Lupo during her visit."  Doc. 52-2 at 3.  That response disputes the facts allegedly reported, but does not clearly dispute the fact of the report.  Despite the ambiguity of Gilmore's response, her subsequent argument indicates that she disputes that Lupo made the report.  *See* doc. 52 at 16-21.  Specifically, she contends that there is a lack of contemporaneous evidence or records of Lupo's observations that "refute[s]" those contentions.  *Id*. at 16.

Plaintiff with a form, either consenting to or "approving" the search, which Plaintiff signed, she contends based on "intimidat[ion] and/or coerc[ion]." *See* doc. 50-2 at 10; doc. 52-2 at 4-5. Milton and Irizarry escorted Plaintiff to a bathroom to perform the search. Doc. 50-2 at 11; doc. 52-2 at 5.

The details of how the search was conducted are also disputed. The parties do not dispute that Plaintiff was required to take off all of her clothing, including underclothing, and hand each item to Irizarry to inspect. Doc. 50-2 at 11; Doc. 52-2 at 5. Defendants contend that Milton and Irizarry "performed a visual body search." Doc. 50-2, p. 11. They contend that, "[o]nce Plaintiff was fully undressed, Lt. Milton directed that plaintiff lift each breast separately . . . and directed that she turn and bend forward at the waist." *Id.* Plaintiff contends that when she had bent forward, and spread her buttocks, "Irizarry swiped in-between Plaintiff's butt cheeks with her gloved hand." Doc. 52-2 at 5. Plaintiff also contends that it was Irizarry who lifted her breasts. *Id.*

## ANALYSIS

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. *See id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant

to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. *Anderson*, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., Fla.*, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* (citation and emphasis omitted).

## I.   Qualified Immunity

Defendants assert that they are entitled to summary judgment on plaintiff's remaining claims based on qualified immunity. *See* doc. 50-1 at 11-20. The Court previously stated the legal standards applicable to assertions of qualified immunity in its analysis of defendants' Partial

Motion to Dismiss.  *See* doc. 37 at 11-12.  As the Court previously explained:

> "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  The doctrine is "intended to 'allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.'" *Hoyt v. Cooks*, 672 F.3d 972, 977 (11th Cir. 2012) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).  As a result, qualified immunity "liberates government agents from the need to constantly err on the side of caution by protecting them both from liability 'and the other burdens of litigation, including discovery.'" *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003) (quoting *Lambert v. Fulton Cnty.*, 253 F.3d 588, 596 (11th Cir. 2001)).  But qualified immunity does not protect an official who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)).

*Id.*

To rely upon qualified immunity, a defendant must first show that he acted within his discretionary authority.  *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1352 (11th Cir. 2015).  Specifically, a defendant must show that he "was (a) performing a legitimate job-related

function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman* ex rel. *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). If a defendant makes the requisite showing, the Court must grant defendants qualified immunity unless plaintiff has shown (a) a violation of the Constitution by any defendant, (b) the illegality of which was clearly established at the time of the incident. *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (citations omitted); *see also Charles v. Johnson*, 18 F.4th 686, 698 (11th Cir. 2021) (quoting *District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 589 (2018)).

For an official to discharge his burden of demonstrating that he acted within his discretionary authority, "there must be a showing by competent summary judgment materials of objective circumstances that would compel that conclusion." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (quoting *Barker v. Norman*, 651 F.2d 1107, 1124-25 (5th Cir. 1981)). The inquiry is fact specific. As the Eleventh Circuit explained:

> Exactly what will suffice to establish such objective circumstances will . . . vary in proportion to the degree of discretion inherent in the defendant's office. Such objective circumstances necessarily must encompass the factual context within which the complained-of conduct took place. But also appropriate is a showing by the defendant of facts

> relating to the scope of his official duties—e.g., a showing of
> the circumstances through which he initially came to believe
> that his lawful authority including within its scope actions of
> the type that are complained of by the plaintiff.

*Id.* (ellipses in original).   The defendants' supplemental brief and supporting declarations, docs. 63 & 63-1, explain that each of the defendants was acting within their respective discretionary authority during the events relevant to plaintiff's claims. *See* doc. 63 at 2-4.  That explanation is undisputed. *See generally* docket.  The Court, therefore, finds that each of the defendants was acting within their discretionary authority during the relevant events. *Cf. Charles*, 18 F.4th at 698 ("It is undisputed that [the defendants] were acting within the scope of their discretionary authority."); *Clay v. Banks*, 2021 WL 5240839, at *4 (S.D. Ga. Aug. 6, 2021) ("Where it is undisputed the [defendant] was acting within her or his discretionary authority, it falls to the plaintiff to 'show that qualified immunity should not apply.'" (quoting *Crocker v. Beatty*, 995 F.3d 1232, 1239-40 (11th Cir. 2021)), *adopted* 2021 WL 4130522 (S.D. Ga. Sept. 10, 2021).

The Court, therefore, proceeds to consider whether the defendants are entitled to qualified immunity.  The Court has discretion in deciding whether to consider first the question of whether plaintiff has shown a

violation of the Constitution by any defendant or whether the right allegedly violated was "clearly established" at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The parties dispute both whether any defendant violated plaintiff's Fourth Amendment rights and, even if there was such a violation, whether the illegality of that conduct was clearly established. *Compare* doc. 52 at 3-5, 12-16 (plaintiff's argument that defendants lacked reasonable suspicion to conduct the challenged search), *and id.* at 5-12 (plaintiff's argument that the law concerning the reasonable suspicion required was clearly established), *with, e.g.,* doc. 55 at 3-14 (defendant's argument that the search did not violate the Fourth Amendment), *and id.* at 14-16 (defendant's argument that the law concerning the reasonable suspicion required was not clearly established).

As the Court previously explained in its Order on the Partial Motion to Dismiss, it's discretion concerning the order of the qualified immunity analysis, provides "flexibility [that] allows the Court to determine, in certain cases, that it can 'rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question of whether the relevant facts make out a

constitutional violation at all.'" Doc. 37 at 13 (quoting *Pearson*, 555 U.S.
at 239 (alterations omitted)).  The Court further explained:

> The violation of a constitutional right is clearly established if
> a reasonable official would understand that his conduct
> violates that right.  *See Coffin v. Brandau*, 642 F.3d 999, 1013
> (11th Cir. 2011) (en banc).  This showing can be made in one
> of three ways.  First, the plaintiff may point to a "materially
> similar case [that] has already been decided" by the Supreme
> Court of the United States, the Eleventh Circuit Court of
> Appeals, or the highest court of the pertinent state, affirming
> the existence of the right and thereby providing fair notice
> that the at-issue conduct would constitute a violation of the
> at-issue right.  *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204
> (11th Cir 2012).  Second, a broad statement of principle from
> "a federal constitutional or statutory provision or earlier case
> law" can provide notice that certain conduct amounts to a
> constitutional violation where the principle "applie[s] with
> 'obvious clarity' to the circumstances, establishing clearly the
> unlawfulness of Defendants' conduct." *Long v. Slaton*, 508
> F.3d 576, 584 (11th Cir. 2007).  Finally, a plaintiff may show
> that the alleged conduct of the officials was "so egregious that
> a constitutional right was clearly violated, even in the total
> absence of case law." *Lewis v. City of West Palm Beach*, 561
> F.3d 1288, 1292 (11th Cir. 2009).

Doc. 37 at 14 (alterations in original).

Plaintiff argues that it is clearly established that correctional
officers must have at least reasonable suspicion to strip search a prison
visitor.[4]  *See* doc. 52 at 5-6.  She argues that the reasonable suspicion

---

[4] The Court's discussion of defendants' Motion to Dismiss recognizes the general
proposition that "a strip search performed without reasonable suspicion violates the

standard was clearly established both by case law and by "obvious clarity." *Id*. at 7-12. The Eleventh Circuit has recently explained that "obvious clarity" depends upon "a principle or provision so clear that, even without specific guidance from a decision involving materially similar facts, the unlawfulness of the officer's conduct is apparent." *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022). Moreover, "obvious clarity 'is a narrow exception to the normal rule that only case law and specific factual scenarios can clearly establish a violation." *Id*. at 921 (quoting *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011)). "If 'case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.'" *Id*. (quoting *Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019)). Finally, courts have recognized that the Fourth Amendment's fact-intensive analyses may narrow the obvious clarity exception even further. *See Coffin v. Brandau*,

---

Fourth Amendment rights of the individual searched." *See* doc. 37 at 19 (quoting *Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 969 n. 6 (11th Cir. 2002)). The recognition occurs in the context of the Court's determination that only the Fourth Amendment, and not the Fourteenth Amendment, governs plaintiff's right to be free from unreasonable searches. *See id*. at 17-19. The principle announced in *Cuesta* is not contrary to the determination, discussed below, that the scope of prison visitors' Fourth Amendment rights are not clearly established. Like *Evans v. Stephens*, 407 F.3d 1272 (11th Cir. 2005), discussed below, *Cuesta* concerns the Fourth Amendment rights of arrestees. *See* 285 F.3d at 969. It is, therefore, no better able to clearly establish the reasonable-suspicion standard for visitor searches than *Evans*.

642 F.3d 999, 1015 (11th Cir. 2011) (" 'Obvious clarity' cases, rare in general, will be even more rare in the Fourth Amendment expectation of privacy context because it is inherently fact-specific, thus not lending itself to clearly established law."); *see also Wesby*, 138 S. Ct. at 590 ("We have stressed that the 'specificity' of the rule [purported to be "clearly established"] is especially important in the Fourth Amendment context." (internal quotation marks and citation omitted)).

The Court, thus, turns first to the case that plaintiff contends clearly establishes the reasonable suspicion standard, *Evans v. Stephens*, 407 F.3d 1272 (11th Cir. 2005). *See* doc.52 at 9. As the Eleventh Circuit has recently reiterated, case law supports that a right is clearly established based on "particularized facts." *Corbitt*, 929 F.3d at 1312 (11th Cir. 2019) (quoting *Loftus*, 690 F.3d at 1204). Plaintiff argues that the facts of *Evans* are "similar enough" to her case to establish that reasonable suspicion was necessary to conduct a strip search. Doc. 52 at 11. Defendants, however, reply that *Evans* itself forecloses an argument that its facts are similar, by expressly disclaiming such similarity. Doc. 55 at 14. Defendants are correct. *Evans* expressly distinguished its factual circumstances, *i.e.* "a post-arrest inventory strip search by the

police looking for evidence," *Evans*, 407 F.3d at 1279, from the factual circumstances of this case, *i.e.* "when jailers—for safety and security purposes—may lawfully conduct strip searches," *id.*   *Evans* simply cannot "clearly establish" that "jailers," like defendants, must have reasonable suspicion to conduct strip searches, when the court volunteers that "[m]ost of us are uncertain" as to the application of that very principle. *Id.* at 1278.[5]

The Court is also unconvinced by plaintiff's argument for a "broad statement of principle," that strip searches on less than reasonable suspicion offend the Constitution.  In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court upheld a general policy of strip-searching pretrial

_____

[5] The Court is mindful of Judge Barkett's description, in dissent, of that assertion as dicta. *See Evans*, 407 F.3d at 1296 (Barkett, J. dissenting).  However, Judge Barkett's admonition only underscores the fact that *Evans* does not "establish," much less "clearly establish" any principle in the context of prison searches for safety and security purposes. *See also id.* at 1296 n. 1 (characterizing the majority's statement as "staking out a position that reasonable suspicion is not required for strip searches under circumstances not at issue in this case," and that discussing those contexts "should occur *in a factually relevant case*" (emphasis added)).

Plaintiff also cites to defendants' concession that "Plaintiff was a visitor, not a detainee, so she may have more privacy rights than a detainee." Doc. 52 at 10 (citing doc. 50-1 at 13).  That concession, however, does not have the effect that Plaintiff needs to conclude that *Evans* controls. *Id.* at 10-11.  Defendants' concession that a visitor "*may*" have more rights does not concede anything about what principles are clearly established by *Evans*.   There is no question that plaintiff's asserted reasonable-suspicion standard "may" be the correct one.  However, the standard she must satisfy is "clearly established," not "clearly possible."

detainees after all contact visits. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 326-327 (2012). In *Florence*, the Court noted the relatively pervasive security policy of "requiring some kind of strip search of everyone who is to be detained." *Id.* at 328. The Court further noted that Courts of Appeals had upheld strip searches of "offenders suspected of committing minor offenses" without reasonable suspicion. *Id.* at 330 (collecting cases). *Florence* itself held that "security imperatives involved in jail supervision" were sufficient to justify a general strip search policy that did not require "reasonable suspicion of a concealed weapon or other contraband." *Id.* at 330. The recognition of permissible strip searches on less than reasonable suspicion contradicts that such searches are "so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis* 561 F.3d at 1292.

Plaintiff cites to decisions of the United States Courts of Appeals for the First, Second, Fifth, Sixth, Seventh, and Eighth Circuits in support of her contention that the reasonable suspicion standard is obvious. *See* doc. 52 at 11. All of those cases predate *Florence*, however. *See id.* The only Court of Appeals that has explicitly considered *Florence*

17

in the context of analyzing the propriety of a strip search of a prison visitor is the Fourth Circuit. *See Calloway v. Lokey*, 948 F.3d 194, 202 (4th Cir. 2020). In *Calloway*, "the parties [did] not dispute [that] the applicable legal principles for conducting a lawful strip search in the prison context" required reasonable suspicion. *Id.* at 201. Despite that agreement, the Court of Appeals discussed the application of *Florence*. *Id.* at 201-02. The court ratified the agreed-upon standard, but, notably, did not concede that it was obvious, stating: "we *now make clear* that, as the parties agree, the standard under the Fourth Amendment for conducting a strip search of a prison visitor—an exceedingly personal invasion of privacy—is whether prison officials have a reasonable suspicion . . . ." *Id.* at 202 (emphasis added). The Court of Appeals would hardly need to make the principle clear if it had been obvious before. The fact that *Calloway* included this language, despite noting the consensus among courts of appeals and extremely suggestive dicta, strongly implies that the reasonable suspicion standard was not obvious. *See id.* at 202.

Less clear, but also suggestive, is the Ninth Circuit's opinion in *Cates v. Stroud*, 976 F.3d 972 (9th Cir. 2020). *Cates* affirmed that officers were entitled to qualified immunity after strip searching a visitor. *See*

*id.* at 985-86.  The Ninth Circuit's analysis is principally concerned with whether visitors, under some circumstances, must be given a choice to leave the prison rather than submit to a strip search.  *Id.* at 985.  In reaching its conclusion concerning a visitor's right to leave a visit rather than submit to a search, the court noted, without citing any specific case, that "[e]xisting *case law* has already clearly established that a strip search of a prison visitor conducted without reasonable suspicion is unconstitutional."  *Id.* at 985 (emphasis added).  The *Cates* court did not rest its conclusion on the obvious application of the reasonable suspicion standard, despite explicitly noting the possibility, *see id.* (citing *Sharp v. Cnty. of Orange*, 871 F.3d 901, 911-12 (9th Cir. 2017)), which implies that it did not find it so.

Finally, defendants point out that the Eleventh Circuit has recognized that the Fourth Amendment rights of "arrestees being booked into a jail or detention facility . . . are not violated by a policy or practice of strip searching each one of them as part of the booking process . . . ." *Powell v. Barrett*, 541 F.3d 1298, 1314 (11th Cir. 2008).  *Powell* noted, in dicta, that inmate claims based on suspicionless strip searches "after contact visits . . . would not have a prayer of surviving . . . ."  *Id.* at 1313;

*see also* doc. 50-1 at 13.[6]  *Powell* also emphasizes that the balancing between Fourth Amendment interests and prison security concerns is even more challenging in the case of contact between inmates and visitors.  *See id.* at 1313-14 (arguing that similarities between arrestees and visitors makes the suspicionless strip searches more appropriate). That analysis, therefore, suggests that prison visitors may present special and distinct issues in the necessary balancing of those competing concerns.

Plaintiff argues, in her attempt to rely on *Evans*, that "the constitutional requirements for strip-searching a person who has been arrested would apply *at a minimum* to a person who has not yet been arrested." Doc. 52 at 9.  *Powell*'s analysis suggests that such a contention is, at least, not obvious.  541 F.3d at 1313-14; *see also, Roberts v. Rhode Island*, 239 F.3d 107, 111 (1st Cir. 2001) ("Although inmates . . . certainly

---

[6] Plaintiff points out that "dicta cannot clearly establish the law for qualified immunity purposes." Doc. 52 at 10 (quoting *Hamilton By and Through Hamilton v. Cannon*, 80 F.3d 1525, 1530 (11th Cir. 1996). Plaintiff is certainly correct that dicta cannot *clearly establish* the law, but her point mistakes her burden. Upon concession that defendants were exercising a discretionary function, the burden shifted to Plaintiff to show that the alleged conduct violated clearly established law. Dicta might suggest factual details that a court found particularly salient, bearing on whether precedent has "materially similar facts." *Cf. Hope*, 536 U.S. at 741. It might also shed light on whether a court considers a particular principle of law obvious; for example, by expressing reservations.

have the opportunity to introduce contraband into the prison, . . . it is far less likely that smuggling of contraband will occur subsequent to an arrest (when the detainee is normally in handcuffed custody) than during a contact visit that may have been arranged solely for the purpose of introducing contraband to the prison population.").  Plaintiff's contention may be persuasive as to the strength of visitors' Fourth Amendment interests, relative to arrestees and detainees.  It is not persuasive however, as to the *balance* of that higher interest against a potentially higher security concern.  *Florence* holds that the deference courts must give to correctional officials' judgment on security matters is, in some circumstances, sufficient to permit suspicionless strip searches.  566 U.S. at 322-23.  If it is reasonable to think that visitors present a *greater* threat to prison security that inmates, in some circumstances, *Powell* and *Florence* preclude a firm conclusion that strip searches of visitors based on less than reasonable suspicion, or perhaps no particularized suspicion at all, are never constitutionally permissible.  *See Cates*, 976 F.3d at 979 ("While some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure, [cit.], the unique

context of the prison facility does not always require individualized suspicion.").

The Court does not suggest that either *Calloway* or *Cates* directly applies to this case, as the disputed search occurred years before those opinions were issued. The Court does, however, find it instructive that despite postdating the events in this case, neither of the Courts of Appeals regarded the reasonable suspicion standard as obvious. *Evans* suggests, contrary to plaintiff's argument, that the quantum of suspicion required in the prison context remains "uncertain." 407 F.3d at 1278. Plaintiff points to no other case from the United States Supreme Court, the Eleventh Circuit, or Georgia Supreme Court that clearly establishes that reasonable suspicion is required to strip search a prison visitor. Instead, Plaintiff expressly relies on "obvious clarity" as the basis for her argument that the law is clearly established. As discussed above, that route is particularly daunting in the Fourth Amendment context. Although Plaintiff has pointed to opinions from other circuits recognizing the standard, she has not pointed to, and the Court has been unable to find, courts of appeals that regard the application of the reasonable suspicion standard as "obvious," even after the date of these events.

22

The Court is not unsympathetic to Plaintiff's argument that reasonable suspicion *should* be required before subjecting a prison visitor to a strip search.[7]   However, "[w]hen properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). To fall into the latter category, the right a defendant is alleged to have violated must be established "beyond debate." *Id*. at 741.  The Court is not satisfied that a prison visitor's Fourth Amendment right to be free from strip searches without reasonable suspicion is clearly established.

---

[7] Plaintiff points out, and defendants do not dispute, that Georgia Department of Corrections Standard Operating Procedures required reasonable suspicion to conduct a strip search.  *See* doc. 52 at 7.  However, her contention that those materials are relevant to whether a right is clearly established, for qualified immunity purposes, is not sufficient.  The only binding authority she cites is *Hope v. Pelzer*, 536 U.S. 730 (2002). Doc. 52 at 7.  However, although the administrative regulations and training were considered in *Hope*, their weight is not clear.  *Id*. at 744.  As the Court noted, "[a]rguably, the violation [at issue] was so obvious that our own Eighth Amendment cases gave respondents fair warning that their conduct violated the Constitution." *Id*. at 741.  Even if *Hope* is not an "obvious clarity" case, the Court cited to two cases, binding in the Eleventh Circuit, that clearly established the violations at issue.  *Id*. at 743-44.  Plaintiff also cites the Ninth Circuit's opinion in *Vasquez v. County of Kern*, 949 F.3d 1153 (2020).  Doc. 52 at 7.  The Ninth Circuit does note the relevance of training materials and regulations, but offer the caveat that they are "not dispositive." *Vasquez*, 949 F.3d at 1164-65.  The *Vasquez* court cited to case law to support that the right at issue was clearly established, and relied upon Prison Rape Elimination Act regulations and training to support the conclusion that the defendant would have understood the application of that case law to the conduct at issue.  *Id*. at 1165-66.  There is no suggestion in either case that the regulations clarity can compensate for a lack of clarity in the applicable law.

Moreover, it is plaintiff's burden to show that qualified immunity is not appropriate. *See, e.g., Charles*, 18 F.4th at 698. Since both her argument that *Evans* is sufficiently analogous and her argument for "obvious clarity" fail, she has not discharged her burden. Accordingly, defendants are entitled to qualified immunity on her Fourth Amendment claims.

As plaintiff argues, however, whether the initiation of the search violated her Fourth Amendment rights, it is possible that the conduct of the search was unconstitutional. *See* doc. 52 at 15-16. Plaintiff points out, and defendants do not deny, that there is a dispute of fact as to whether Irizarry touched Plaintiff during the conduct of the search. *Id.* at 16; *see also* doc. 55 at 14. The Court struggles to even discern an argument that defendants are entitled to qualified immunity on Plaintiff's claim that the scope of the search violated her Fourth Amendment rights. *See* doc. 55 at 13-14. It is clear that the legal analysis differs substantially. For example, *Florence* expressly recognizes that "[t]here also may be legitimate concerns about the invasiveness of searches that involve . . . touching . . . ." 566 U.S. at 339. *Powell*, as well, expressly limits its holding to searches "no more intrusive on privacy interests than those upheld in the *Bell* case," *i.e.* "*visual* body cavity

inspections." 541 F.3d at 1306, 1314.  However, it is not clear that the contours of the law applicable to contact searches is any more "clearly established" than that applicable to visual searches.

Despite the suggestiveness of plaintiff's argument, she bears the burden to show that her rights, related to the quantum of suspicion necessary to justify a contact strip search, were clearly established.  *See, e.g., Ingram v. Kubik*, 30 F.4th 1241, 1250(11th Cir. 2022) (defendants are entitled to qualified immunity if plaintiff fails to show that right was clearly established).  The specific section of her brief arguing that the search was excessively invasive relies exclusively on authority discussing arrestees and detainees.  *See* doc. 52 at 15-16 (citing *Bell*, 441 U.S. at 558-559; *Evans v. City of Zebulon, Ga.*, 351 F.3d 485, 492 (11th Cir. 2003)[8]). *Bell* concerned the rights of pretrial detainees.  *See Bell*, 441 U.S. at 558-60 (considering whether requirement that all "[i]nmates . . . expose their

---

[8]  The opinion in *Evans* plaintiff cites here is the panel opinion that ultimately led to the *en banc* opinion in *Evans v. Stephens*, 407 F.3d 1272 (11th Cir. 2005).  *See Evans*, 407 F.3d at 1275, 1277-1278 (discussing procedural history)).  Even assuming that the vacated opinion in *Evans* had *any* force after it was vacated, the panel expressly found that "the general legal principles stated in *Bell* . . . do not apply with such obvious clarity to the facts of this case that no reasonable officer could have believed that the manner in which the strip searches of the appellees were performed was constitutional."  *Evans*, 351 F.3d at 495-96.

body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution."). *Evans,* as discussed extensively above, also concerned individuals who were detained, specifically arrestees. *See Evans*, 407 F.3d at 1275; *see also Evans*, 351 F.3d at 487-89 (discussing factual background). For the reasons discussed above, cases discussing the scope of detainees' rights do not obviously apply to prison visitors. Moreover, *Florence* calls into questions whether the sort of *a fortiori* argument plaintiff attempts, *see* doc. 52 at 9 ("Any reasonable law enforcement officer would understand that the constitutional requirements for strip-searching a person who has been arrested would apply *at a minimum* to a person who has not yet been arrested."), is valid. Plaintiff has failed to show that her right, related to contact strip-searches, was clearly established. Defendants are, therefore, also entitled to qualified immunity against any claim that the manner of the search violated plaintiff's rights.

The Court should find that plaintiff has not borne her burden to show that the right at issue was clearly established at the time of defendants' alleged misconduct. *See, e.g., Pearson*, 555 U.S. at 232; *Ingram*, 30 F.4th at 1250. Accordingly, defendants' Motion for Summary

Judgment should be **GRANTED**, to the extent that it asserts defendants are entitled to qualified immunity on Gilmore's Fourth Amendment claim.  Doc. 50, in part.

## II.    Defendant Smith's Supervisory Liability

The Court previously dismissed a portion of Plaintiff's supervisory liability claim against Defendant Smith.  Doc. 37 at 23 (dismissing the claim "to the extent [it] relies on procedures and practices . . .").  However, a supervisory liability claim against Defendant Smith remained, "to the extent [it] relies on Defendant Smith ordering the search" at issue.  *Id.*  Defendants contend that "DW Smith is due summary judgment, both on the merits of Plaintiff's claim and based on qualified immunity."  Doc. 50-1 at 20.  His arguments are cursory, at best.  *See id.* at 20-21.  If defendants' presentation is cursory, plaintiff' response is non-existent.  *See generally* doc. 52.  Her sur-reply brief is also silent.  *See generally* doc. 61.  Her failure to respond does not, alone, merit a grant of summary judgment.  *See One Piece of Real Property Located at 5800 SW 74th Ave.,*

*Miami, Fla.*, 363 F.3d at 1101-02.  The Court, therefore, considers the merits of defendants' arguments, such as they are.[9]

The most plausible construction of defendants' argument is that Plaintiff, who will bear the burden of proof on Smith's liability, cannot produce evidence to discharge her burden.  The Eleventh Circuit has recognized that, where the non-movant on summary judgment would bear the burden of proof at trial, "the moving party simply may show— that is, point out to the district court—that there is an absence of evidence to support the non-moving party's case." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) (internal quotation marks, alterations, and citation omitted).  If the movant points to such a gap, the non-moving party has two options. "First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was overlooked or ignored by the moving

---

[9] Smith's assertion of qualified immunity is, perhaps, the stronger argument.  As discussed above, there is no dispute that he was acting within his discretionary authority.  As such, the burden on his assertion of qualified immunity shifts to plaintiff.  Her utter disregard of Smith's claim, obviously, does not discharge her burden.  However, since neither party has even discussed the application of qualified immunity in the context of supervisory liability, and the Court finds that Smith is entitled to summary judgment on the argument he makes more explicitly, the Court has not considered whether he is otherwise entitled to qualified immunity.

party, who has thus failed to meet the initial burden of showing an absence of evidence.  [Cit.]  Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17 (internal quotation marks and citations omitted).  Regardless of the alternatives, however, the non-moving party must either point to, or submit, evidence.

"[I]t is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1047 (11th Cir. 2014) (citation omitted); *see also* doc. 37 at 20.  "Instead, to hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation. *Keith*, 749 F.3d at 1047-48.  "In short, the standard by which a supervisor is held liable in his official capacity for the actions of a subordinate is extremely rigorous." *Id.* at 1048 (internal quotations and citation omitted).

The only portion of the supervisory liability claim that survived the Partial Motion to Dismiss was the claim against Smith "to the extent the

claim relies on Defendant Smith ordering the search . . . ."  Doc. 37 at 23.

The closest Plaintiff ever comes to addressing the supervisory claim

against Smith is her concession, in a footnote, that "based on discovery

there is a genuine dispute as to who ordered the search or if it was

ordered at all."  Doc. 52 at 20.  The only evidence she cites in support of

that "dispute" is her own testimony.  *Id.* (citing "Ex. 2, Pl. Dep. 181:24-

182:20").   In that testimony Plaintiff states, explicitly, she "wouldn't

know who ordered [the search]," and that she is "taking the position of

I'm not sure who ordered it."  Doc. 52-4, p. 83.  Plaintiff's ignorance about

who ordered the search is, quite obviously, insufficient to support a claim

against Smith "to the extent [it] relies on Defendant Smith ordering the

search . . . ."  She has, therefore, failed to discharge her burden and Smith

is entitled to summary judgment on the supervisory liability claim.

Accordingly, to the extent that it requests summary judgment on that

claim, defendants' Motion should be **GRANTED**.  Doc. 50, in part.

### III.  Punitive Damages

Defendants move for summary judgment on Plaintiff's claim for

punitive damages.  Doc. 50 at 1.  Their argument is premised on their

assertion that "Plaintiff's final claim is one for punitive damages *under*

*Georgia state law*." Doc. 50-1 at 21 (emphasis added).  Plaintiff appears to agree.  Doc. 52 at 21-22.  They're both wrong.

The Eleventh Circuit has noted that "a prayer for punitive damages is not an independent cause of action."  *Byrne v. Nezhat*, 261 F.3d 1075, 1093 n. 34 (11th Cir. 2001) *abrogated on other grounds as recognized by Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1357 n.10 (11th Cir. 2018)).  Section 1983 provides for punitive damages, wholly independently from state law.  *See, e.g., Kolstad v. American Dental Ass'n,*, 527 U.S. 526, 535-36 (1999).  To the extent that Plaintiff's Amended Complaint included claims under Georgia law, the Georgia punitive damages statute may have been relevant to this case.  *See, e.g.,* doc. 37 at 5-9 (discussing Plaintiff's state law claims).  All of those claims have been dismissed, however.  *Id.* at 23 (dismissing all state law claims, except claims asserted against Defendant Williams); doc. 40 at 4-5 (dismissing all claims against Defendant Williams).  It is unclear, and defendant does not clarify, whether the Georgia statute continued to apply to this case at all after the state law claims were dismissed.  The Court is inclined to think it did not.  *Cf. Alday v. Groover*, 2014 WL 1320093, at *9 (S.D. Ga. Mar. 30, 2014) (discussing punitive damages, in a case involving both

state law and Section 1983 claims, as available "as a matter of federal law under 42 U.S.C. § 1983 <u>or</u> Georgia law under O.C.G.A. § 51-12-5.1." (citation omitted)); *Boyette v. American Intern. Adjustment Co., Inc.*, 1994 WL 156292, at *13 (N.D. Ga. Mar. 31, 1994) (declining to apply subsection of O.C.G.A. § 51-12-5.1 in a federal question case).

Since Plaintiff cannot assert a free-standing claim for punitive damages, pursuant to O.C.G.A. § 51-12-5.1, there is no pending state law claim for that statute to apply to, and the only remaining federal cause of action provides independently for the availability of punitive damages, Defendants' Motion for Summary Judgment, pursuant to O.C.G.A. § 51-12-5.1 should be **DENIED as moot**.  Doc. 50, in part.  Since the Court recommends above the remaining federal claims should be dismissed, if the District Judge adopts that recommendation, there will be no substantive claim remaining.  Any question of punitive damages under the currently pending federal claims, therefore, will be moot.

## CONCLUSION

In summary, Defendants' Motion for Summary Judgment should be **GRANTED, in part**, and **DENIED, in part**.  Doc. 50.  Defendants' Motion should be **GRANTED** to the extent that it seeks summary

judgment on defendants' qualified immunity against plaintiff's Fourth Amendment claim. It should also be **GRANTED** to the extent that it seeks summary judgment on the supervisory liability claim against Defendant Smith, pursuant to 42 U.S.C. § 1983. Finally, Defendants' Motion should be **DENIED** as moot, to the extent that it seeks summary judgment on Plaintiff's entitlement to punitive damages under Georgia law.

This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and Recommendations." Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are

advised that failure to timely file objections will result in the waiver of rights on appeal.  11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED,** this <u>10th</u> day of May, 2022.

CHRIST  PHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA